UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BANK OF AMERICA, N.A., individually and
as successor to LaSalle Bank, National Association,
a national banking association,

                Plaintiff,                  **MEMORANDUM AND ORDER**
                                            11 CV 2044 (DRH) (ARL)

      - against -

MARK FISCHER and WAYNE M. WAHRSAGER,

                Defendants.
-----------------------------------------------------------------X
**APPEARANCES:**

**MAYER BROWN LLP**
Attorneys for Plaintiff
1675 Broadway
New York, NY 10019
By:    Jean-Marie L. Atamian, Esq.
       Allison M. Stowell, Esq.

**PACHULSKI STANG ZIEHL & JONES LLP**
Attorneys for Defendant Mark Fischer
780 Third Ave, 36th Floor
New York, NY 10017
By:    John A. Morris, Esq.

**WAYNE M. WAHRSAGER, *Pro Se***


**HURLEY, Senior District Judge:**

        Bank of America, N.A. ("plaintiff" or "Bank of America") commenced this diversity

action against Mark Fischer ("Fischer") and Wayne Wahrsager ("Wahrsager") (collectively, the

"defendants") for breaching their guaranties in connection with a $17.5 million loan to New York

Merchants Protective Co., Inc. ("NYMP"), a company owned and controlled by the defendants.[1]

---

[1] On May 10, 2011, the present action was transferred from the Northern District of
Illinois to the Eastern District of New York.

Presently before the Court is Bank of America's motion, made pursuant to Federal Rule of Civil Procedure ("Rule") 56, seeking summary judgment against the defendants for the full amount of the loan in addition to other amounts owed by NYMP. For the reasons set forth below, plaintiff's motion is GRANTED.

### PRELIMINARY MATTERS

Before the Court can set forth those facts which are material to Bank of America's motion, there are threshold issues that need to be resolved first. These issues include what evidence may be considered in light of the defendants' invocation of their Fifth Amendment privilege against self incrimination, and the weight the evidence may be given based on the defendants' failure to comply with Rule 56.1 of the Local Civil Rules of the U.S. District Court for the Southern and Eastern Districts of New York ("Local Rule 56.1").

First, Wahrsager's affidavit in opposition to the plaintiff's motion for summary judgment will not be considered in light of his invocation of the Fifth Amendment privilege against self incrimination during his deposition.[2] It is well-settled that a party in a civil proceeding has the right to assert the privilege against self-incrimination. *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 316, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976); *United States v. 4003-4005 Fifth Ave.*, 55 F.3d 78, 82 (2d Cir. 1995). However, "[b]ecause of the potential for abuse of the privilege by defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, the courts recognize the appropriateness of imposing sanctions for a civil defendant's assertion of the privilege during discovery." *United States v. Inc. Vill. of Island*

---

[2] However, those portions of Wahrsager's affidavit which essentially serves as his memorandum of law (*i.e.*, raises legal arguments as opposed to facts) will be considered.

2

*Park*, 888 F. Supp. 419, 431 (E.D.N.Y. 1995); *see also City of New York v. Golden Feather Smoke Shop, Inc.*, 2010 WL 2653369, at \*4 (E.D.N.Y. June 25, 2010) ("Where a litigant has sought to use the Fifth Amendment to abuse or obstruct the discovery process, a district court can prevent prejudice to opposing parties and adopt remedial measures or impose sanctions.").  For example, "a decision to assert the privilege during pre-trial depositions may be valid grounds . . . for striking affidavits opposing summary judgment motions."  *Inc. Vill. of Island Park*, 888 F. Supp. at 431.

During his January 10, 2012, deposition, Wahrsager invoked his Fifth Amendment privilege in response to every question with the exception of his name.  (Atamian Decl., Ex. 39 .)  These questions involved the same issues and events which Wahrsager now attempts to dispute in his affidavit.  Under similar circumstances, courts have not considered affidavits submitted in opposition to a motion for summary judgment.  *See Bourgal v. Robco Contracting Enters.*, 969 F. Supp. 854, 862 (E.D.N.Y. 1997) (barring defendants, who avoided producing almost any discovery by invoking the Fifth Amendment privilege, "from creating issues of fact by submitting affidavits in support of their opposition to the [plaintiff's] motion for summary judgment"); *Inc. Vill. of Island Park*, 888 F. Supp. at 431 ("In view of [defendants'] repeated invocation of their Fifth Amendment privilege at deposition, their 'eleventh hour' attempt to avoid the consequences of asserting that privilege by submitting affidavits in opposition to [plaintiff's] summary judgment motion constitutes an abuse of the discovery procedure which should not be permitted.").  Thus, the Court will not consider Wahrsager's affidavit in ruling on Bank of America's motion for summary judgment.

Second, Bank of America satisfied its obligations under Local Rule 56.1 by submitting "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," together with "citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." *See* Local R. 56.1(a), (d). In response, defendants were required to provide "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" followed by citations to admissible record evidence. *See* Local R. 56.1(b), (d). Notwithstanding this obligation, neither defendant complied.[3] Instead of submitting a 56.1 counter-statement, Fischer's attorney submitted a declaration which fails to respond to each numbered paragraph in plaintiff's 56.1 statement of undisputed material facts ("Plaintiff's 56.1 Statement"). In fact, this declaration does not dispute 233 of the 235 paragraphs of material facts contained in Plaintiff's 56.1 Statement.[4] Counsel's declaration merely emphasizes that, with two exceptions, all of the fraudulent conduct asserted by plaintiff were in connection with conduct by defendant Wahrsager. (*See* Morris Decl. ¶¶ 1-16, 21-22.) As for Wahrsager, he filed a document denominated "Counter-Statement of Material Facts and Affidavit in Opposition" which disputes

---

[3] Both defendants also failed to comply with this Court's Individual Practice Rule 3(k) which contains the additional requirement that "the papers opposing a motion for summary judgment shall reprint the movant's numbered paragraphs before providing a responsive paragraph."

[4] As for the two paragraphs which are disputed, Fischer claims that the cited evidence does not support the factual assertions presented, namely that he was personally involved in fraudulent conduct. However, as explained in the text *infra*, Fischer's liability to the plaintiff hinges on the nature of the guarantee that he signed, not on his personal involvement, if any, in the underlying wrongdoing.

only 59 of the 235 paragraphs of material facts contained in Plaintiff's 56.1 Statement.[5] (*See* Wahrsager Aff. at 4-23.) However, in virtually all of Wahrsager's responses he simply recites his own version of the facts devoid of any citation to record evidence.[6]

Local Rule 56.1 instructs that where a paragraph is not specifically controverted by the opposing party it "will be deemed to be admitted for purposes of the motion." Local R. 56.1(c); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). However, "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001).

While acknowledging that it has discretion "to overlook a party's failure to comply with local court rules," *id.* at 73, the Court declines to do so here. Fischer's failure to comply is inexcusable as he was represented by counsel. While Wahrsager is appearing *pro se* at this juncture, Bank of America provided him with the required notice to *pro se* litigants opposing motions for summary judgment pursuant to Local Rule 56.2. (*See* Docket No. 90.) Attached to the Local Rule 56.2 Notice was the full text of Rule 56 and Local Rule 56.1. (*Id.*) Warshager's *pro se* status is therefore not a basis to overlook this District's Local Rules. *See, e.g.*, *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (finding that if proper notice is sent under

---

[5] In some cases, Wahrsager addresses multiple paragraphs in plaintiff's 56.1 Statement with one counter-statement, also in contravention of Local Rule 56(b).

[6] As explained *supra*, the factual assertions in Wahrsager's affidavit will not be considered.

Local Rule 56.2, "[*p*]*ro se* litigants are then not excused from meeting the requirements of Local Rule 56.1")  Accordingly, all material facts set forth in Plaintiff's 56.1 Statement are deemed admitted to the extent that they are adequately supported with record evidence.

Having now addressed the above threshold evidentiary issues, attention will now be directed to the material facts which serve as the basis for plaintiff's motion for summary judgment.

## BACKGROUND

### Defendants

At all times relevant to this action, Fischer and Wahrsager owned and controlled NYMP, an electronic security and monitoring company which sells, installs, leases, maintains and monitors electronic security systems primarily for commercial customers and municipal entities in the Tri-state area and provides wholesale monitoring of alarm systems across various national markets.  Fisher was a fifty-percent shareholder who served as NYMP's Chief Technology Officer.  Wahrsager, who was also at one point a fifty-percent shareholder,[7] served as NYMP's President and Chief Executive Officer.

### Loan Documents

On January 31, 2006, LaSalle Bank National Association ("LaSalle" or "Bank") entered into a Loan and Security Agreement ("Loan Agreement") with NYMP and certain of its subsidiaries (the "Borrowers"), as well as the defendants (also referred to as the "Guarantors").[8]

---

[7] Wahrsager's ownership percentage decreased to 34.25 percent by December 31, 2009.

[8] Two other entities, New York Merchants Alarm Response Inc. and NY Merch Prot Co., Inc., executed the Loan Agreement as "Corporate Guarantors."

6

(Atamian Decl., Ex. 3 ("Loan Agreement").) Pursuant to the Loan Agreement, LaSalle agreed to provide NYMP, *inter alia*, a revolving line of credit with a maximum principal amount of $15 million ("Revolving Loan") to (i) refinance existing indebtedness with General Electric Capital Corporation; (ii) to settle in full all outstanding obligation to the Internal Revenue Service and the New York State Department of Revenue; (iii) support internal growth of subscriber contracts; (iv) to finance acquisitions permitted hereby; and (v) fund working capital. (Loan Agreement §§ 1.1, 2.1(a).) The Loan Agreement contained a "borrowing base formula" to calculate NYMP's available credit at any given time (hereafter, "Borrowing Base Amount").[9] (Loan Agreement § 1.1.) To determine the maximum principal amount that could be borrowed, NYMP was required to deliver to LaSalle a monthly "Borrowing Base Certificate" whereby the treasurer or chief financial officer of NYMP certified to the accuracy of the Borrowing Base Amount.[10] (Loan Agreement § 7.9.)

Pursuant to the Section 3.1(a)(vii) of the Loan Agreement, Fischer and Wahrsager each executed a Limited Continuing Unconditional Guaranty simultaneous with the execution of the Loan Agreement (collectively, the "Guaranties"). (Loan Agreement § 3.1; Atamian Decl., Exs. 1-2.) The Guaranties provide that:

> the Guarantor hereby unconditionally and absolutely guaranties to the Bank . . . the payment in full, promptly on demand of the Bank . . . of

---

[9] Under this formula, NYMP was entitled to borrow twelve times "Eligible Wholesale RMR," not to exceed $1.8 million plus between 22 to 24 times "Eligible RMR," depending on the calculated attrition rate of customers. "Eligible Wholesale RMR" and "Eligible RMR" represent two separate streams of recurring monthly revenue (referred to as "RMR") for NYMP.

[10] In particular, the Borrowing Base Certificate reported NYMP's "Eligible RMR" and "Eligible Wholesale RMR" for each month and contained the calculations utilized to come up with these figures.

> (a) up to the principal amount of Five Million and 00/100 Dollars ($5,000,000.00) of the Indebtedness . . . plus (b) all costs, legal expenses and attorneys' and paralegals' fees of every kind (including those costs, expenses and fees of attorneys and paralegals who may be employees of the Bank, its parent or affiliates), paid or incurred by the Bank in endeavoring to collect all or any part of the foregoing, in enforcing this Guaranty . . . plus (c) interest on the foregoing from and after demand from the Bank to the Guarantor for payment, at a floating per annum rate of interest equal to the Prime Rate plus five percent (5.00%) (collectively, the "***Guaranteed Debt***").

(Atamian Decl., Exs. 1-2.)  "Indebtedness" is defined in the Guaranties as follows:

> (a) any and all indebtedness, obligations and liabilities of every kind and nature of the Borrower to the Bank . . . howsoever evidenced, whether now existing or hereafter created or arising direct or indirect, primary or secondary, absolute or contingent, due or to become due, several or joint and several, and howsoever owned, held or acquired, whether through discount, overdraft, purchase, direct loan or as collateral, or otherwise, plus (b) all interest due or to become due thereon, plus (c) all costs, legal expenses and attorneys' and paralegals' fees of every kind . . . paid or incurred by the Bank in endeavoring to collect any of the foregoing indebtedness, obligations and liabilities of the Borrower or any part thereof . . . or in enforcing this Guaranty . . . .

(*Id.*)  The Guaranties also provide that:

> Notwithstanding anything to the contrary contained herein, the Guarantor shall have: (a) unlimited liability with respect to the payment and performance of the Indebtedness if (i) there is fraud with respect to the Indebtedness by either the Borrower and/or any of its shareholders, officers or directors, or the Guarantor, (ii) either the Borrower or the Guarantor contests, delays or otherwise hinders any action taken by the Bank in connection with the appointment of a receiver for the assets of the Borrower or the foreclosure of the liens, mortgages or other security interests created by any of the documents evidencing or securing the Indebtedness . . . .

(*Id.*)

On August 23, 2007, the Loan Agreement was modified by the execution of a Waiver, Consent and First Amendment to Loan and Security Agreement and Reaffirmation of Pledge Agreement, Guaranties and Subordination Agreement ("First Amendment").  (Atamian Decl., Ex 5 ("First Amendment").)  The First Amendment, *inter alia*, increased the maximum principal amount of the Revolving Loan to $17.5 million and modified the borrowing base formula.  (First Amendment § 5.2.)  Pursuant to the First Amendment, each of the Guarantors expressly "reaffirm[ed], assume[d] and b[ou]nd[] itself in all respects to the obligations, liabilities, duties, covenants, terms and conditions that are contained in its respective Guaranty."  (First Amendment § 7.)  In connection with the First Amendment, a Replacement Revolving Note in the amount of $17.5 million was executed by Wahrsager as President of NYMP.  (Atamian Decl., Ex. 4.)

On August 19, 2009, the Loan Agreement was further modified by a Waiver and Second Amendment to Loan and Security Agreement and Reaffirmation of Pledge Agreement, Guaranties and Subordination Agreement ("Second Amendment").  (Atamian Decl., Ex. 6 ("Second Amendment").)  Pursuant to the Second Agreement, the borrowing base formula was once again modified and the Guarantors expressly reaffirmed, assumed and bound themselves "in all respects to the obligations, liabilities, duties, covenants, terms and conditions contained" in their  respective Guaranties. (Second Amendment §§ 4, 7.)

### Bank of America

The Loan Agreement provided that "[t]he Bank may at any time assign the Bank's rights in this Agreement, and other Loan Documents, the Obligations, or any part thereof."  (Loan Agreement § 12.7.)  Effective October 1, 2007, Bank of America acquired LaSalle, and as part of

the acquisition, LaSalle merged with Bank of America. Pursuant to this merger, Bank of America became the successor-in-interest to LaSalle regarding the Loan Agreement and Guaranties. (Atamian Decl., Ex. 56.)

***Fraudulent Activity***

As of June 30, 2008, NYMP had drawn down $17.5 million, the maximum principal amount under the Revolving Loan. (Atamian Decl., Ex. 45 ("Czerwinski Aff.") ¶ 2.) NYMP's financial difficulties worsened to the point that NYMP's independent auditors' report for the year ending December 31, 2009 stated that NYMP "has suffered recurring losses from operations and has a working capital deficiency and a net capital deficiency, which raise substantial doubt about its ability to continue as a going concern." (Atamian Decl., Ex. 7 at 1.) This audit report stated that the uncertainty about NYMP's ability to continue as a going concern was based on the fact that it had "incurred a net loss of $1,743,751 during the year ended December 31, 2009, and as of that date, the Company's current liabilities exceeded its current assets by $19,647,775 and its total liabilities exceeded its total assets by $18,725,044." (*Id.* at 15.)

In February 2010, Wahrsager began kiting checks between NYMP's checking account at Bank of America and the checking account of SeniorCare 911 at Signature Bank. NYMP's Chief Financial Officer Bertrem Wasserman ("Wasserman") acknowledged that he was aware of Wahrsager kiting checks as early as February 2010. (Atamian Decl., Ex. 41 ("Wasserman Dep.") at 131.) During this month, Wahrsager signed and deposited checks into NYMP's checking account which were drawn from SeniorCare 911's checking account for amounts that exceeded its balance. For example, Wahrsager deposited into NYMP's checking account the following checks from SeniorCare 911's checking account: Check Number 2491 in the amount of

$152,029.15 on February 2, 2010; (2) Check Number 2496 in the amount of $146,101.19 on February 3, 2010; and (3) Check Number 2499 in the amount of $173,000 on February 11, 2010. (Atamian Decl., Ex. 9 at 383-84, 478; Ex. 10 at 1-2; Ex 11. at 4.)  However, on the date these checks were deposited, SeniorCare 911's checking account had either a zero or negative balance, and the checks were returned for insufficient funds.  (Atamian Decl., Ex. 10 at 5-6; Ex. 11 at 2, 4-5.)

Wahrsager continued this conduct in May 2010 by depositing at least eight checks into NYMP's account which were drawn from SeniorCare 911's checking account.  (Atamian Decl., Ex. 9 at 385-391, 479; Ex. 12 at 1-3; Ex. 13 at 4.)  These checks totaling over $1.5 million were returned for insufficient funds.  (Atamian Decl., Ex. 12 at 6-7; Ex. 13 at 2-3, 5.)  In June 2010, the number of checks drawn from SeniorCare 911's account and deposited into NYMP's account, all of which were thereafter returned for insufficient funds, increased to approximately 20.  (Atamian Decl., Ex. 9 at 392-410; Ex. 14 at 1-9; Ex. 15 at 2-5.)  In July 2010, the number of checks deposited and returned back to SeniorCare 911's account for insufficient funds ballooned to almost 40.[11]  (Atamian Decl., Ex. 9 at 411-444, 481-483; Ex. 16 at 1–11; Ex. 17 at 2-4.)

On or about July 16, 2010, Bank of America e-mailed Wahrsager to inform him that it had received notice that SeniorCare 911's checking account had been closed.  (Atamian Decl., Ex. 19.)  Nevertheless, Wahrsager continued to deposit checks drawn from the closed SeniorCare 911 checking account into NYMP's checking account at a rapid pace.  In fact, between August 1 and 4, 2010, Wahrsager issued twenty-five checks ranging in value from $295,000 to $299,000

---

[11]  While at least nine other checks were issued from SeniorCare 911's checking account in July 2010, they were not deposited with NYMP until August 2010.  (*See* Atamian Decl., Ex. 9 at 445-452, 456.)

from SeniorCare 911's closed account which were then deposited in NYMP's checking account throughout August.[12] (Atamian Decl., Ex. 9 at 12, 453-455, 457-477; Ex 18 at 1-12.)

Bank of America employee Barbara Rajchel ("Rajchel") testified that in August 2010, NYMP's Revolving Loan was transferred to the Special Assets Group ("SAG"), which specialized in managing high risk commercial loans. (Atamian Decl., Ex. 42 ("Rajchel Dep.") at 9, 11-12.) The Revolving Loan was transferred to SAG due to the suspicious nature of numerous checks being returned with non-sufficient fund notices and because NYMP had maxed out their line of credit. (*Id.* at 31-32.) Following the transfer, Rajchel, who worked in the SAG, assumed the day-to-day responsibility for managing the relationship between plaintiff and NYMP. (*Id.* at 13.) After an investigation was conducted in late August 2010, it was determined that the checks being returned for insufficient funds was not by mistake. (*Id.* at 35.) In particular, Bank of America learned that when Wahrsager was depositing these insufficiently funded checks, NYMP was receiving credit for the checks giving the account the appearance of a positive available balance. (*Id.* at 36.) Therefore, it became clear that Wahrsager "was deliberately depositing checks into the New York Merchants Bank of America account to inflate the available balance so that the company could use those funds, even though they knew there would be no funds coming from Signature Bank, because there were no funds there." (*Id.* at 56-57.) Through this conduct, Wahrsager managed "[t]o keep illusionary positive balances in the bank, which permitted him to take money out." (*Id* at 36.)

---

[12] It is noteworthy that had the Court considered the facts contained in the "counter-statement" portion of Wahrsager's Affidavit, he did not dispute any of the deposits made from SeniorCare 911 to NYMP's checking account.

After learning of this conduct, Bank of America called the branch office Wahrsager was utilizing to deposit checks and prohibited them from taking any deposits from him. (*Id.*) Then, on September 10, 2010, Rajchel sent a Notice of Default to NYMP and defendants in which she notified them of numerous defaults under the Loan Agreement, which included the "improper manipulation of the Obligor's bank accounts, which has resulted in overdrafts in excess of $1,400,000" and the "Borrower's failure to repay immediately Debt (presently in excess of $1,400,000) owing to the Bank resulting from the aforementioned overdrafts." (Atamian Decl., Ex. 30 ("Notice of Default").) Not only did defendants not dispute any of the statements contained in the Notice of Default, but Wasserman testified that the Events of Default occurred. (Rajchel Dep. at 38-39; Wasserman Dep. at 70.) Although Bank of America had the ability to immediately exercise all rights and remedies available under the Loan Agreement, Rajchel set up a September 16, 2010 meeting with NYMP, attended by Wahrsager and Wasserman (Notice of Default at 2; Rajchel Dep. at 72-74, 77.)

At this meeting, Wahrsager was confronted about the check kiting scheme and the fact that "knowingly submitting checks that you know there's no funds for at another bank is fraud." (Rajchel Dep. at 75-76.) In response, Wahrsager admitted to and took full responsibility for the check kiting scheme. (*Id.* at 76; Wasserman Dep. at 154, 157.) Wahrsager explained at this meeting that he had initially kited checks hoping that NYMP's cash flow would improve. (Rajchel Dep. at 76.) On September 29, 2010, Wahrsager sent Fisher the following written apology:

> I am very sorry for the trouble that I have caused for you and the company. I apologize for my actions. I have told you in person and repeat here that I and I alone am responsible for the situation that

> exists with Bank of America. You had no knowledge of what I was
> doing and bear no responsibility. I acted out of my own pride. What
> I did was wrong and I will dedicate myself to rectifying this
> nightmare.

(Atamian Decl., Ex. 22.) Wahrsager also expressed concern about potential criminal sanctions in

connection with the check kiting scheme to Robert Gorin, an employee of the financial

consulting firm Getzler Henrich and Associates. (Atamian Decl., Ex. 43 at 36-37.)

On October 27, 2010, Rajchel sent NYMP and defendants an amended Notice of Default,

informing them of additional defaults under the Loan Agreement. (Atamian Decl., Ex. 31

("Amended Notice of Default").) Then, on October 28, 2010, Rajchel sent NYMP and

defendants a Notice of Intent to Accelerate and to Begin to Exercise Remedies. (Atamian Decl.,

Ex. 32.) This letter indicated that the "Bank is close to making a determination that a mutually

acceptable resolution is not attainable under the existing circumstances and accordingly, the

Bank should accelerate the Obligations and begin to exercise remedies, including the institution

of collection actions against the Guarantors." (*Id.*) On November 3, 2010, Rajchel sent a

"Notice of Imposition of Default Rate and Acceleration of Obligations" ("Notice of

Acceleration") to NYMP and defendants. (Atamian Decl., Exs. 33.) The Notice of Acceleration

stated that "(1) the Bank is instituting the default rate of interest under the Loan Agreement,

effective as of today, and (2) all Obligations under the Loan Documents have been accelerated

and accordingly, are immediately due and payable." (*Id.*) Furthermore, defendants were notified

that as of November 1, 2010, the obligations totaled $18,942,066.37, which included, *inter alia*,

"$17,500,000.00 in principal advances under the Loans, $16,041.67 in accrued and unpaid

interest on the Loans, and $1,426,024.70" in connection with the overdrafts resulting from the

check kiting  (*Id.*)

Contemporaneous with the Notice of Acceleration, Rajchel sent defendants a Notice of Demand for Payment Under Guaranties ("Notice of Demand").  The Notice of Demand stated the following:

> This is also to notify you that the Bank is hereby making demand upon each of you under your respective guaranty for payment in full of the Obligations. . . . [U]nder the express terms of your Guaranty, you each have unlimited liability for the Indebtedness upon the occurrence of fraud, whether or not you individually participated in the fraud, so long as the fraud was by the Borrower and/or by the Borrower's shareholders, officers, or directors. . . . [A] check-kiting scheme . . . which involved Borrower bank accounts and, at a minimum, was perpetrated by the Borrower, constitutes a clear instance of fraud."

(Atamian Decl., Ex. 34.)  Therefore, the defendants were notified that they were each jointly and severally liable to Bank of America for all of NYMP's Obligations, and a sum of $19,112,074.69 was demanded.[13]  (*Id.*)

## DISCUSSION

### I.    *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

---

[13]  Although Bank of America asserts facts supporting other fraudulent conduct by defendants, the Court need not address such conduct in order to rule on the present motion.  The same is true regarding those facts addressing conduct by Wahrsager in hindering Bank of America from attempting to recover the sums owed.

material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot rely on the allegations in his or her pleadings, on conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *Adverse Inference Against Defendants*

As previously discussed, a party in a civil proceeding has the right to assert the privilege against self-incrimination. *See, e.g.*, *Baxter*, 425 U.S. at 316; *4003-4005 Fifth Ave.*, 55 F.3d at 82. Notwithstanding that right, "[a] court may draw an adverse inference against a party who asserts his Fifth Amendment privilege in a civil matter, because the invocation of the privilege results in a disadvantage to opposing parties by keeping them from obtaining information they could otherwise get." *S.E.C. v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010) (internal citation omitted); *see also S.E.C. v. Pittsford Capital Income Partners L.L.C.*, 2007 WL 2455124, at *14 (W.D.N.Y. Aug. 23, 2007) ("[L]itigants denied discovery based upon an assertion of the privilege may ask the court to draw a negative inference from the invocation of that right."). "An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader." *LiButti v. United States*, 178 F.3d 114, 120

(2d Cir. 1999).

"While the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.'" *LiButti v. United States*, 107 F.3d 110, 124 (quoting *4003-4005 Fifth Ave.*, 55 F.3d at 83). "However, a motion for summary judgment cannot be granted on an adverse inference alone; rather, the inference must be weighed with other evidence in the matter in determining whether genuine issues of fact exist." *Suman*, 684 F. Supp. 2d at 386; *accord Monteleone v. Leverage Grp.*, 2008 WL 4541124, at *7 (E.D.N.Y. Oct. 7, 2008); *see also Inc. Vill. of Island Park*, 888 F. Supp. at 432 (finding that the moving party "must produce independent corroborative evidence of the matters to be inferred before liability will be imposed" (internal quotation marks omitted)).

At their respective depositions, both Fischer and Wahrsager invoked their Fifth Amendment privilege against self-incrimination in response to every question with the exception of their name. Based on their blanket Fifth Amendment privilege assertions, the Court draws a negative inference against defendants as to all aspects of plaintiff's breach of guaranty claims.

### III.     *Procedural Arguments Against Summary Judgment*

Before addressing whether summary judgment should be granted on plaintiff's breach of guaranty claim, the Court must address two preliminary arguments raised in Wahrsager's opposition papers. First, pursuant to Rule 56(d), Wahrsager requests that the Court "defer considering the motion or deny it until such time that I am able to obtain affidavits or declaration[s] or to take further discovery to conduct the depositions of the Receiver, Ronald J.

18

Friedman, Esq., and several other individuals who have intimate knowledge of the facts and circumstances that will allow me to obtain essential facts to further justify my opposition." (Wahrsager Aff. ¶ 5.)  Second, Wahrsager requests that he be permitted to amend his Answer so that he can "raise affirmative defenses and counterclaims consistent with the facts presented in [his] affidavit."  (*Id.* ¶ 2.)  These contentions, neither of which have merit, will be addressed separately.

### A.    *Additional Discovery*

Pursuant to Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  The affidavit must explain "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."  *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004); *accord Hoffman v. Airquip Heating & Air Conditioning*, 480 F. App'x 110, 112 (2d Cir. 2012) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Although Wahsrsager argues that he needs additional discovery in order to obtain essential facts to further justify his opposition, his affidavit falls woefully short of addressing the necessary criteria for allowing such additional discovery at this late stage.  Wahrsager claims that he needs to depose Ronald J. Friedman, Esq., who was appointed to act as Receiver of NYMP, about the "numerous acts or omissions that the Receiver committed and continues to commit which contributed to and exacerbated . . . my alleged indebtedness to the Plaintiff under the . . .

guaranty documents." (Wahrsager Aff. ¶ 5.) This conclusory allegation fails to explain how such purported acts or omissions by the Receiver would raise a genuine issue of material fact regarding Wahrsager's breach of his guaranty and the kite checking fraud, *i.e.*, conduct that occurred prior to the Receiver being appointed on January 19, 2011.

Wahrsager also claims that in addition to the Receiver, "further essential facts which are unavailable to me require taking the depositions of and receiving testimony from: (1) the individuals from TRG Associates, the company hired by the Receiver to manage NYMP . . .; (2) David Stang of Bank of America; (3) Peter Theobald of KRG Associates; and (4) Richard Rockwell, the buyer in the Asset Purchase Agreement approved by the court for the sale of NYMP's assets." (Wahrsager Aff. ¶ 7.) It is clear that some of the requested discovery relates to Wahrsager's disapproval of how the Receiver ran NYMP after he was appointed. These issues, as previously explained, are not germane to this lawsuit. To the extent that any of the above individuals may have information essential to justify Wahrsager's opposition to Bank of America's motion for summary judgment, the defendant neglects to articulate what these specific facts are and fails to explain how such discovery would lead to evidence establishing genuine issues of material fact in this case. *See Halebian v. Berv*, 869 F. Supp. 2d 420, 440 (S.D.N.Y. 2012) ("Plaintiffs apparent inability to identify the facts that he seeks with any particularity reveals that his motion for discovery [under Rule 56(d)] is a *de facto* application for a fishing expedition.").

Finally, Wahrsager maintains that he did not have the opportunity to cross-examine witnesses whose depositions were conducted in Illinois. (Wahrsager Aff. ¶ 3.) This contention is misleading and inaccurate. The only deposition that took place in Illinois rather than New

York was former Bank of America employee Rajchel, who resides near Chicago, Illinois. (*See* Stowell Aff., Exs. G-I, N; Atamian Decl., Ex. 39-44.) In any event, Wahrsager was represented by counsel during the entire discovery period and never objected to any aspect of Rajchel's deposition . For reasons unknown to the Court, Wahrsager and his counsel declined to take a single deposition and elected not to attend most of the depositions Bank of America conducted.[14] The fact that defendant is now proceeding *pro se* does not absolve him of failing to conduct discovery through his counsel within the discovery deadlines.

In sum, Wahrsager's request to defer or deny plaintiff's motion for summary judgment so that he can take additional discovery pursuant to Rule 56(d) is denied.

### B.      Amendment of Answer

In Wahrsager's affidavit, he also requests permission to amend his answer to "assert defenses and counterclaims on theories of Lender Liability, for [Bank of America's] breach of fiduciary duties and obligations during its control of [NYMP] and its assets, and for violations of the Uniform Commercial Code for [ ] failure to properly dispose of seized collateral, the assets of [NYMP] in a commercially reasonable matter."[15]  (Wahrsager Aff. ¶ 9.)  In response, Bank of America argues that Wahrsager's request to amend his answer should be denied because the defendant has failed to establish good cause under Rule 16(b).  While the Court agrees with the

---

[14]  Although Wahrsager was represented, he attended the depositions of Wasserman and Fischer without counsel.

[15]  To the extent that Wahrsager seeks to amend his Answer, without leave, the Court notes that a party is not entitled to amend its pleading through statements made in opposition papers. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 544 (S.D.N.Y. 2003) ("A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint.").

conclusion urged by plaintiff, the basis for denying Wahrsager's request to amend his answer is not pursuant to Rule 16 precedent.

Bank of America is correct in the sense that when a motion to amend a pleading is filed after the deadline to do has expired, courts analyze the motion under the more demanding Rule 16(b) standard. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007) ("Although Rule 15(a) governs the amendment of pleadings, Rule 16(b) also may limit the ability of a party to amend a pleading if the deadline specified in the scheduling order for amendment of the pleadings has passed."); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleading after the deadline set in the schedule order where the moving party has failed to establish good cause." ). However, in arguing for the more stringent good cause standard under Rule 16(b), Bank of America glosses over the non-existence of a scheduling order containing a deadline for the amendment of pleadings. After a review of all orders entered in this case, this Court could not locate an order which established a deadline for either party to amend their pleadings. Nor does Bank of America indicate that such a deadline was ever set in either the Northern District of Illinois or this District. Therefore, Rule 16(b) is not applicable under the present circumstances.

Nevertheless, leave to amend will generally be denied, even under the more lenient Rule 15(a) standard, "when the motion to amend is filed solely in an attempt to prevent the Court from granting . . . summary judgment, particularly when the new claim could have been raised earlier." *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997); *accord Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000); *see also Ansam Assocs., Inc. v. Cola Petro., Ltd.*, 760

F.2d 442, 446 (2d Cir. 1985) (no abuse of discretion to deny leave to amend where discovery has ended and the opposing party had already filed a summary judgment motion). Based on the fact that the information Wahrsager relies on to assert these purported defenses and counterclaims were contained in an affidavit he filed in a related action on April 19, 2011, it is evident that Wahrsager asserts them at this juncture simply to avoid and delay a decision on plaintiff's summary judgment motion. Therefore, even if Wahrsager otherwise had a proper legal footing to assert these defenses and counterclaims,[16] his request to amend is denied.

## IV.    *Breach of Guaranty*

It is undisputed that Illinois law applies pursuant to the terms of the Loan Agreement and Guaranties. Under Illinois law, "a plaintiff establishes a prima facie case for the enforcement of a guaranty 'when the plaintiff enters proof of the original indebtedness, the debtor's default, and the guarantee.'" *LaSalle Bus. Credit, Inc. v. Lapides*, 2003 WL 722237, at *13 (N.D. Ill. Mar. 3, 2003) (quoting *Mid-City Indus. Supply Co. v. Horowitz*, 476 N.E.2d 1271, 1277 (Ill. App. Ct. 1985)); *accord Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 799 (N.D. Ill. 2010). In situations where the guaranty is executed at the same time as the original obligation, "no separate consideration for the guaranty is required." *Bank of Montreal v. SK Foods, LLC*, 2010 WL 3385534, at *3 (N.D. Ill. Aug. 19, 2010).

---

[16] Moreover, the Court notes that Wahrsager's Guaranty indicates that "the Guarantor waives every defense, cause of action, counterclaim or setoff which the Guarantor may no have or hereafter may have to any action by the Bank in enforcing this Guaranty." (Atamian Decl., Ex. 1 at 6.) In addition, pursuant to the Guaranty, Wahrsager waived any claims and defenses of the Borrower. (*Id.* at 5.)

Here, Bank of America has presented sufficient evidence establishing that: (1) NYMP was indebted to it as evidenced by the Loan Agreement and Replacement Revolving Note; (2) NYMP defaulted under the Loan Agreement as evidenced by the Notice of Default and Amended Notice of Default; and (3) defendants executed Guaranties on January 31, 2006 in connection with the Loan Agreement. In fact, Fischer admits that NYMP defaulted under the Loan Agreement, that he and Wahrsager signed Guaranties, and consents to the entry of judgment against him in the amount of $5 million plus costs and expenses. (Morris Decl. ¶¶ 2, 6-8; Fischer Opp'n at 1.) As such, Bank of America is entitled to summary judgment on its breach of guaranty claims. *See, e.g.*, *Silverman*, 693 F. Supp. 2d at 800; *S.P. Richards Co. v. Business Supply Corp.*, 2008 WL 4181729, at *3 (N.D. Ill. Sept. 5, 2008).

However, the more significant question that is presented in this case is whether defendants, who each guaranteed $5 million of the total Indebtedness, is subject to unlimited liability based on the submitted evidence and the terms of their Guaranties. "In Illinois, a guaranty is a legally enforceable contract that must be construed according to its terms, so long as they are clear and unambiguous." *F.D.I.C. v. Rayman*, 117 F.3d 994, 998 (7th Cir. 1997). "This remains the case even where a guaranty contains broad statements of guarantor liability." *Gen. Elec.*, 693 F. Supp. 2d at 800. "If the words used in the contract are unambiguous, [the court] must give them their plain and ordinary meaning." *Barth v. State Farm Fire & Cas. Co.*, 886 N.E.2d 976, 982 (Ill. 2008); *accord Bruner v. Ill. Cent. R.R. Co.*, 578 N.E.2d 1385, 1387 (Ill. App. Ct. 1991). The Court finds nothing unclear or ambiguous about the defendants' Guaranties generally, or the unlimited liability provision in particular.

Pursuant to their respective Guaranties, Wahrsager and Fischer would be subject to unlimited liability where "there is fraud with respect to the Indebtedness by either the Borrower and/or any of its shareholders, officers or directors, or the Guarantor."  (Atamian, Exs. 1-2.) Although the Guaranties do not define what constitutes "fraud," that fact alone does not turn an otherwise unambiguous contract into an ambiguous contract.  *See People v. Montoya*, 868 N.E.2d 389, 392 (Ill. App. Ct. 2007) (applying Black's Law definition of "fraud" where statute did not define term).  A standard definition of "Fraud" is a "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment."[17]  Black's Law Dictionary 731 (9th ed. 2009).  After applying the plain and ordinary meaning of fraud to the undisputed material facts, there can be no meaningful doubt that Wahrsager's conduct was an occurrence of fraud under his Guaranty.[18]

---

[17]  Defendant Fischer appears to argue that to satisfy the fraud provision under his Guaranty, Bank of America would have to establish the elements of a common-law fraud claim under Illinois law.  (Fischer Opp'n at 2-3.)  The Court finds this interpretation to be unpersuasive as the Guaranties do not contain such limiting language.  *Cf Barth*, 886 N.E.2d at 982 (finding that nothing in the text of the contract provision "purports to rely on common law fraud definitions, and we are not persuaded that those definitions may be properly imposed here").  In any event, the Court notes that the elements of an Illinois common-law fraud claim encompasses the every-day definition of fraud, and the submitted evidence would have satisfied all elements to such a claim.  *See Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. App. Ct. 1995) (to establish common-law fraud, a plaintiff must establish that defendants, "with the intent to induce plaintiffs to act, made a false statement of material fact which defendants knew or believed to be false" and plaintiffs "relied on the statement and suffered damages resulting from that reliance").

[18]  In fact, the act of check kiting is an exemplar of bank fraud.  *First Nat'l Bank v. Colonial Bank*, 898 F. Supp. 1220, 1222 (N.D. Ill. 1995) (citing 18 U.S.C. § 1344; *United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994)).  "Check kiting, at root, is a plan designated to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds."  *U.S. v. Doherty*, 969 F.3d 425, 428 (7th Cir. 1992).

A clear instance of fraud with respect to the Revolving Loan (*i.e.*, a knowing misrepresentation of the truth to induce Bank of America to act to its detriment) can be found in Wahrsager's actions occurring in and around August 2010. The month prior, Bank of America e-mailed Wahrsager to inform him that it received notice that SeniorCare 911's checking account, which Wahrsager had control of and access to, had been closed. Nevertheless, in a four-day period between August 1 and 4, 2010, Wahrsager issued twenty-five checks from the closed SeniorCare 911 account and deposited them in NYMP's checking account with Bank of America. The purpose behind this action was to inflate the available balance in NYMP's checking account so that money could be taken out from this account before the check would bounce for insufficient funds. Accordingly, beginning with inference that Wahrsager acted fraudulently in connection with the Indebtedness (*infra*, Part II), coupled with the virtually undisputed evidence which independently establishes such fraudulent conduct, the Court finds that the Guaranty subjects Wahrsager to unlimited liability with respect to the full payment of NYMP's Indebtedness.

While not contesting that Wahrsager committed fraud, Fischer argues that plaintiff has not offered any evidence establishing that he personally committed fraud. (Fischer Opp'n at 2-4.) Even accepting the contention that he was not personally involved in fraudulent conduct as true, his argument would still fail. The Guaranty which Fischer executed indicates that he would be subject to unlimited liability if there is fraud by *any* of NYMP's shareholders, officers or directors. (Atamian Decl., Ex. 2.) Because Wahrsager was a shareholder and officer of NYMP, both Wahrsager and Fischer incurred unlimited liability as a result of Wahrsager's fraudulent conduct. While the Court is sympathetic towards Fischer, who, according to Wahrsager, had no

knowledge of his conduct, the fact remains that Fischer incurred unlimited liability with respect to the full payment of NYMP's Indebtedness by virtue of Wahrsager's actions.

## V.     _Damages_

Bank of America contends that summary judgment should be granted in the amount of $24,452,835.35, plus interest, attorney's fees and costs as defined in the Guaranties.  To support this figure, plaintiff submits the affidavit of Thomas Czerwinski, Vice President at Bank of America.  Based upon his personal knowledge and a review of plaintiff's books and records, Czerwinski states that as of April 17, 2012, the Indebtedness totaled $24,452,835.35, which consists of: (1) $17,500,000 in principal advances; (2) $2,726,313.63 in accrued interest on the principal; (3) $1,513,245.33 in overadvances in NYMP's Bank of America checking account; (4) $91,402.20 in connection with the early termination of the hedging transactions; and (5) $4,024,471.15 in protective advances.  (Czerwiski Aff. ¶¶ 1-6.)  Czerwinski further states that Bank of America has never received any payment on the Indebtedness from any source." (_Id._ ¶ 9.)

Given that Czerwinski's affidavit is admissible evidence as to the amount of Indebtedness owed to Bank of America, coupled with the adverse inference against defendants in connection with the amount of the Indebtedness owed by NYMP, the various notices sent to defendants documenting the amount of the Indebtedness at various points throughout 2010, the Guaranties defining Indebtedness to cover "all indebtedness, obligations and liabilities of every kind and nature" of NYMP to Bank of America, and the fact that neither defendant disputes these figures with any record evidence of their own, the Court awards plaintiff  $24,452,835.35 in damages, plus interest, attorney's fees and costs.

*CONCLUSION*

For the foregoing reasons, plaintiff's motion for summary judgment against Warshager and Fischer is granted in the amount of $24,452,835.35, plus interest, attorney's fees and costs as defined in their Guaranties.

**SO ORDERED.**

Dated:  Central Islip, New York
        February 25, 2013

_____/s/_____
Denis R. Hurley
Unites States District Judge